**HIMMELSTEIN & ADKINS**

David E. Shein (011708)
Erik D. Smith (033060)
6720 North Scottsdale Road, Suite 261
Scottsdale, Arizona 85253
(480) 922-3933
DES@H-A.law
EDS@H-A.law
Minutes@H-A.law

Duncan McCreary *(Pro Hac Vice Pending)*
**MCCREARY, PC**
6080 Center Dr. 6th Fl.
Los Angeles, CA 90045
(310) 409-8861
djm@mccrearypc.com
*Attorneys for Plaintiffs*

## UNTIED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Aaron Automotive Group, Inc., a California corporation; Aaronm 2020, Inc., d/b/a Aaron Ford of Poway, a California corporation; Neelam Inc., d/b/a Aaron Ford of Lake Elsinore, a California corporation; Aaron Mehandroo LLC, d/b/a Aaron Ford of Escondido, a California limited liability company; Kritimotors Inc., d/b/a Aaron Chevrolet, a California corporation; and Rnm 2020 Inc., d/b/a Aaron Cdjr of Norco, a California corporation; <br><br> Plaintiffs, <br><br> v. <br><br> Automotive Training Network LLC, an Arizona limited liability company; and Mark Gilbert, an individual; <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT** <br><br> [JURY TRIAL DEMANDED] |

1

Plaintiffs Aaron Automotive Group, Inc., AARONM 2020, Inc., d/b/a Aaron Ford of Poway, Neelam Inc., d/b/a Aaron Ford of Lake Elsinore, Aaron Mehandroo LLC, d/b/a Aaron Ford of Escondido, Kritimotors Inc., d/b/a Aaron Chevrolet, and RNM 2020 Inc., d/b/a Aaron CDJR of Norco (collectively, the "Dealerships" or "Plaintiffs"), respectfully bring this civil action by and through their attorneys, for their Complaint against Defendants Automotive Training Network LLC ("ATN") and Mark Gilbert ("Gilbert" and together with ATN, "Defendants") (collectively, hereinafter Plaintiffs and Defendants may be referred to as "Parties"), allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This is a civil action for fraud, negligent misrepresentation, breach of contract, and declaratory relief, and for cancellation of an unauthorized financing statement, arising out of a written Client Services Management Agreement (the "Agreement") under which Defendant Automotive Training Network, LLC promised to provide the Dealerships with a comprehensive suite of automotive-dealership consulting, management, and training services in exchange for substantial monthly and onboarding fees. ATN took the Dealerships' money but provided none of the promised services. ATN then compounded its misconduct by recording a UCC-1 financing statement against the Dealerships' assets that the Agreement did not authorize.

2.      Plaintiffs seek rescission of the Agreement and restitution of all monies paid to ATN; compensatory and consequential damages; punitive damages; a declaration that the Agreement is void and that ATN's UCC-1 financing statement is unauthorized and ineffective; an order directing termination of that financing statement together with the statutory remedies available under Arizona's Uniform Commercial Code; and an award of attorneys' fees, costs, and interest.

## JURISDICTION

3.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it is a civil action between citizens of different States —

2

Plaintiffs are citizens of California and Defendant is a citizen of Arizona — and the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C.A. § 1332 (West).

## VENUE

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant resides in this district, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district. 28 U.S.C.A. § 1391 (West). Venue is also consistent with the parties' Agreement, in which they agreed that any litigation related to the Agreement would be brought in the state or federal courts having jurisdiction over Maricopa County, Arizona. *See Agreement* § 9(f).

## PARTIES

5. Plaintiff Aaron Automotive Group, Inc. is a corporation organized under the laws of California with its principal place of business in Poway, California, where it operates motor-vehicle dealerships. Aaron Automotive Group is a citizen of California.

6. Plaintiff AARONM 2020, Inc., d/b/a Aaron Ford of Poway is a corporation organized under the laws of California with its principal place of business in Poway, California, where it operates a motor-vehicle dealership. Aaron Ford of Poway is a citizen of California.

7. Plaintiff Neelam Inc., d/b/a Aaron Ford of Lake Elsinore is a corporation organized under the laws of California with its principal place of business in Lake Elsinore, California, where it operates a motor-vehicle dealership. Aaron Ford of Lake Elsinore is a citizen of California.

8. Plaintiff Aaron Mehandroo LLC, d/b/a Aaron Ford of Escondido is a limited liability company organized under the laws of California with its principal place of business in Escondido, California, where it operates a motor-vehicle dealership. Aaron Ford of Escondido is a citizen of California.

9. Plaintiff Kritimotors Inc., d/b/a Aaron Chevrolet is a corporation organized under the laws of California with its principal place of business in Lake Elsinore, California, where it operates a motor-vehicle dealership. Aaron Chevrolet is a citizen of California.

10. Plaintiff RNM 2020 Inc., d/b/a Aaron CDJR of Norco is a corporation organized under the laws of California with its principal place of business in Norco, California, where it operates a motor-vehicle dealership. Aaron CDJR of Norco is a citizen of California.

11. Defendant Automotive Training Network LLC is a limited liability company with its principal place of business at 15020 N. Hayden Rd., Ste. 202, Scottsdale, Arizona. Upon information and belief, each of ATN's members is a citizen of Arizona, and none is a citizen of California, such that ATN is a citizen of Arizona and is completely diverse from each Plaintiff. ATN holds itself out as a provider of consulting, management, and training services to automotive dealerships.

12. Defendant Mark Gilbert is an individual who is a citizen of Arizona upon information and belief.

**FACTS**

13. From August 26, 2025 to August 29, 2025, the Dealerships' principal Vikas Mehandroo ("Mr. Mehandroo") attended the 2025 Annual Conference of National Association of Minority Automobile Dealers in Las Vegas, NV (the "Conference"). During the Conference, Mr. Mehandroo and Penul Raj Clement ("Clement"), who were previously acquainted, ran into each other and began discussing ATN's services. Mark Gilbert was also present during this initial conversation.

14. Subsequently, during the Conference, Mr. Mehandroo received an invitation for a dinner which was hosted by ATN's CEO Mark Gilbert. During that dinner, Gilbert promised Mr. Mehandroo that ATN's systems could increase productivity and efficiency in multiple areas of the Dealerships' operations. Mr. Gilbert touted ATN's

services such as monthly reports, digital advertising, sales processes and fixed operations management.

15.    Mr. Mehandroo also met with Mr. Gilbert on several occasion subsequent to the Conference again promising vast improvements in productivity and efficiency.

16.    After these promises were made by Gilbert, on or about January 16, 2026, the Dealerships and ATN entered the Agreement, which the Parties executed and which was completed by all signatories on January 22, 2026. *See Agreement*. A true and correct copy of the Agreement is attached as **Exhibit A**.

17.    The Agreement provided that ATN would furnish the Dealerships with "general management operation services in the field of Automotive Dealerships," with services starting fully on March 1, 2026, following an onboarding month in February 2026 and a six-month initial term. *See Agreement § 2(a)*.

18.    Under Section 1 of the Agreement, ATN agreed to provide Management Services that included analyzing customer needs and current business obstacles, identifying projects, scoping potential business solutions, improving processes by coordinating efforts through personnel and process training, advising on marketing approaches, recommending products and services, personnel deployment, process development and execution, expense approval and allocation, and overseeing revenue processes and procedures. *See Agreement § 1*.

19.    The Agreement's consulting summary described the ATN Client Management Package as including three executive visits monthly to review financials, performance, and plans, together with Executive Strategy Sessions; ten separate specialist visits for all locations; and daily remote services. *See Agreement*.

20.    The Agreement further committed ATN to a comprehensive program across every dealership department, including business development center training and build-out, monthly digital advertising oversight, sales showroom process training, finance and insurance (F&I) training, fixed-operations management, dealership branding,

5

and executive management and review, with weekly meetings to review and track progress across all projects. *See Agreement.*

21.    As part of fixed-operations management, ATN agreed to document and improve the Dealerships' service processes, including appointment setting, the greeting and service walk-around, dispatching, inspection, parts ordering and estimating, consultation and customer communication, and service delivery. *See Agreement.*

22.    In exchange, the Dealerships agreed to pay ATN an onboarding fee equal to $18,000 per dealership, due upon execution of the Agreement, plus a monthly fee of $18,000 per dealership during the term; no monthly fee was billed to Aaron Ford of Poway. *See Agreement* § 3.

23.    The Dealerships performed their obligations under the Agreement, including paying ATN the onboarding and monthly fees as well as travel expenses in amounts exceeding $216,000.

24.    Despite Gilbert's promises, ATN failed to perform the promised services.

25.    Among other things, ATN provided no meaningful guidance, no strategic planning, no meaningful live training, and no consistent development process, and it failed to maintain communication with the Dealerships.

26.    ATN failed to train the Dealerships' technicians on the video multi-point inspection (MPI) process mandated by Ford for the Ford Care Program ("FCP").

27.    ATN failed to set up correct pricing in the Dealerships' Reynolds and Reynolds dealer management system ("DMS") for all maintenance and BG operation codes ("Opcodes").

28.    ATN did not conduct the executive and specialist visits, Executive Strategy Sessions, weekly progress meetings, or daily remote services that the Agreement required, and did not install or improve the processes, reporting, or training it had promised across the Dealerships' departments. *See Agreement* at 5.

29.    Before the Dealerships signed the Agreement, ATN — through its representatives, including its chief executive officer, Mark Gilbert — represented to the

Dealerships' principal, Vikas Mehandroo, that ATN had the personnel, expertise, and present intent to deliver the full scope of services described in the Agreement.

30. Those representations were false. ATN did not intend to provide, and did not provide, the promised services, and ATN lacked any reasonable basis for representing that it would deliver them.

31. The Dealerships reasonably and justifiably relied on ATN's representations in entering into the Agreement and paying ATN, and would not have done so had they known the truth.

32. Section 3(c) of the Agreement provided that only payments unpaid more than 60 days would be subject to a security interest in favor of ATN, "placed as a UCC-1 asset filing on the clients dealership assets," and that ATN would provide 30 days' prior written notice of intent to file before any such filing. *See Agreement* § 3.

33. The Dealerships never authenticated any security agreement granting ATN a security interest in any collateral, and no provision of the Agreement granted ATN a present security interest in the Dealerships' assets. *See Agreement* § 3. Moreover, the description contained in the Agreement is unenforceable and void *ab initio*.

34. Notwithstanding the foregoing, ATN caused a UCC-1 financing statement to be filed against the Dealerships that described the collateral as "client dealership assets."

35. ATN did not provide the 30 days' prior written notice of intent to file required by Section 3(c); any notice ATN gave was provided only by email. *See Agreement* § 3.

36. The Dealerships were not in default of any payment obligation that could give rise to a security interest under Section 3(c), and ATN was not entitled to file the financing statement. *See Agreement* § 3.

//        //

//        //

7

## COUNT I — FRAUD

### (All Plaintiffs Against All Defendants)

37.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

38.    ATN made material representations to the Dealerships, before they signed the Agreement, that it had the personnel, expertise, and present intent to deliver the full scope of services described in the Agreement, including guidance, strategic planning, live training, a consistent development process, ongoing communication, executive and specialist visits, technician training on the Ford-mandated video MPI process, and correct DMS pricing setup for all maintenance and BG opcodes. *See Agreement* § 1.

39.    ATN's representations were material and were false or omitted material information when made. ATN knew the representations were false, or made them with reckless disregard for their truth, and ATN intended that the Dealerships rely on them in deciding to enter into the Agreement and pay ATN.

40.    ATN's chief executive officer, Mark Gilbert, made these representations to the Dealerships' principal, Vikas Mehandroo, during the dinner which took place at the Conference and during the negotiation of the Agreement that the parties executed on January 16, 2026. The representations were false or omitted material information because ATN never intended to perform, and did not perform, the promised services.

41.    The Dealerships were ignorant of the falsity of ATN's representations, justifiably relied on them in entering the Agreement and paying ATN, and had a right to rely on them.

42.    As a direct and proximate result of ATN's fraud, the Dealerships have been injured, including by paying onboarding and monthly fees to ATN and by incurring consequential losses, in an amount to be proven at trial. Because the Dealerships' claim is based in fraud, the Agreement's limitation-of-liability provision does not bar recovery of consequential damages, and ATN's conduct entitles the Dealerships to an award of punitive damages. *See Agreement* § 7.

8

**COUNT II — NEGLIGENT MISREPRESENTATION**

**(All Plaintiffs Against All Defendants)**

43.     Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

44.     In the course of its business, ATN supplied the Dealerships with false information for their guidance in deciding whether to enter into the Agreement and pay ATN, including representations about the services ATN would provide. ATN failed to exercise reasonable care or competence in obtaining or communicating that information, and the Dealerships justifiably relied on it.

45.     As a direct and proximate result of ATN's negligent misrepresentations, the Dealerships have suffered pecuniary loss, including the onboarding and monthly fees they paid to ATN and consequential damages, in an amount to be proven at trial.

**COUNT III — BREACH OF CONTRACT**

**(All Plaintiffs Against Defendant Automotive Training Network, LLC)**

46.     Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

47.     The Agreement is a valid and enforceable contract between the Dealerships and ATN. *See Agreement.*

48.     The Dealerships performed their obligations under the Agreement, including paying the onboarding and monthly fees due. *See Agreement* § 3.

49.     ATN breached the Agreement by failing to perform substantially all of the services it promised, including the executive and specialist visits, Executive Strategy Sessions, weekly progress meetings, daily remote services, departmental training and process installation, technician training on the Ford-mandated video MPI process, and DMS pricing setup for all maintenance and BG opcodes. *See Agreement* .

50.     As a direct and proximate result of ATN's breach, the Dealerships have been damaged in an amount to be proven at trial, including the fees they paid to ATN and

9

consequential damages. This claim is pleaded in the alternative to Plaintiffs' claims for rescission and restitution.

## COUNT IV — DECLARATORY RELIEF

**(All Plaintiffs Against Defendant Automotive Training Network, LLC)**

51.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

52.    An actual, justiciable controversy of sufficient immediacy and reality exists between the Dealerships and ATN concerning the validity and enforceability of the Agreement and ATN's authority to file the UCC-1 financing statement.

53.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and A.R.S. §§ 12-1831 *et seq*,  this Court may declare the rights and legal relations of the parties. 28 U.S.C.A. § 2201 (West).

54.    The Dealerships contend that the Agreement is void and unenforceable due to ATN's fraud and its total failure to perform, and that ATN's UCC-1 financing statement is unauthorized and ineffective.

55.    The Dealerships are entitled to a judicial declaration that the Agreement is void and unenforceable and that ATN's UCC-1 financing statement is unauthorized, ineffective, and of no legal effect.

## COUNT V — CANCELLATION OF UNAUTHORIZED FINANCING STATEMENT A.R.S. §§ 47-9509, 47-9625

**(All Plaintiffs Against Defendant Automotive Training Network, LLC)**

56.    Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as though fully set forth herein.

57.    Under Arizona's Uniform Commercial Code, a person may file an initial financing statement only if the debtor authorizes the filing in an authenticated record, including by authenticating a security agreement, and a filed record is effective only to the extent it is filed by a person entitled to file it. A.R.S .§ 47-9509; A.R.S. § 47-9510.

10

58.    A security interest is enforceable against the debtor only if value has been given, the debtor has rights in the collateral, and the debtor has authenticated a security agreement that describes the collateral. A.R.S. § 47-9203.

59.    The Dealerships never authenticated any security agreement granting ATN a security interest, and no provision of the Agreement granted ATN a present security interest. ATN therefore was not entitled to file the UCC-1 financing statement, which is ineffective. A.R.S. § 47-9510.

60.    In addition, the financing statement's description of the collateral as "client dealership assets" does not reasonably identify any collateral, because a description of collateral as all of the debtor's assets, or words of similar import, is insufficient. A.R.S. § 47-9108.

61.    Because the Dealerships did not authorize the filing, ATN is required, within 20 days after an authenticated demand, to cause a termination statement to be filed or sent, and the Dealerships are entitled to an order directing termination of the financing statement. A.R.S. § 47-9513.

62.    The Dealerships are further entitled to recover the actual damages caused by ATN's noncompliance and statutory damages of $500 for ATN's filing of a record it was not entitled to file and for any failure to file or send a required termination statement. A.R.S. § 47-9625.

**WHEREFORE**, Plaintiffs request judgment as follows:

A.    A judgment declaring that the Agreement is void and unenforceable;

B.    Rescission of the Agreement and restitution of all monies the Dealerships paid to ATN;

C.    In the alternative to rescission, compensatory damages, general and special, in an amount to be proven at trial;

D.    Consequential damages proximately caused by ATN's fraud, negligent misrepresentation, and breach of contract, in an amount to be proven at trial;

E.    Punitive damages in an amount sufficient to punish ATN and deter similar conduct;

F.    A judgment declaring that ATN's UCC-1 financing statement is unauthorized, ineffective, and of no legal effect; directing ATN to file or send a termination statement for that financing statement; and awarding the statutory remedies, including the $500 statutory penalty and actual damages;

G.    Temporary Restraining Order, Preliminary Injunction and/or Permanent Injunction striking ATN's UCC-1 financing statement;

H.    Plaintiffs' reasonable attorneys' fees together with costs of suit and pre- and post-judgment interest as allowed by law.

I.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED: July 9, 2026.

**HIMMELSTEIN & ADKINS**

By____*/s/ Erik D. Smith*_____
   David E. Shein
   Erik D. Smith
   6720 North Scottsdale Road, Suite 261
   Scottsdale, Arizona 85253

   Duncan McCreary *(Pro Hac Vice Pending)*
   **MCCREARY, PC**
   6080 Center Dr. 6th Fl.
   Los Angeles, CA 90045

   *Attorneys for Plaintiffs*

# EXHIBIT

# A



# ATN Client Services Management Agreement

Prepared for:
Vikas Mehandroo
Aaron Auto Group

Prepared by:
Automotive Training Network



# Stuker BDC Training
*In-house Development Every Month*

Your **Typical Departmental Action Plan** will consist of the following phases:

## Phase 1 – Solidify
- **Personnel** – Right person, right position, right pay. More specific assignments for each person (specializing).
- **Technology & Functionality** – Functional CRM, Telephone System, Call Recording/Monitoring, CRM Workflows, Email Blasts, Text Hosting, BDC Location, Accessibility, Ergonomics, Sound Barriers, etc.
- **Process Installation** – Create and document all BDC processes, including Inbound Phone-Up Worksheets, Appointment Setting, Manager T/O, Customer Follow-up, BDR Scheduling, etc.
- **Reporting** – Create daily, weekly and monthly reports that will flow from the BDC. & Sales Department We'll make sure we know exactly where to find the relevant data in the CRM, and have a convenient way to communicate the reports to Management and Ownership.

## Phase 2 – Maximize
- Leads - Maximize Lead Counts for Current BDC Model
- Performance - Ensure Satisfactory Percentages in the following areas:
  - Appointment Set %
  - Appointment Show %
  - Leads to Close %
- Spending - Make sure we're Maximizing Advertising Dollars Spent with Each Lead Provider

## Phase 3 – Expand
- Continue Improving Sales Process and potentially expand staff

- Continue Improving Internet Effectiveness
- Continue Improving BDC Effectiveness
- Beginning Adding Additional BDC Staff
- Begin Laying Foundation for NOC

To review, your investment will get you access to ATN's team of experts to do any interviewing, hiring, training, process installation, follow-up and reporting necessary to build a strong, lasting BDC in your dealership.



## AllDigits

*Monthly Digital Advertising Oversight*

### Digital Advertising

- **Website** – Analyze and optimize dealership websites to drive conversions
- **Third-Party Providers** – Review monthly performance and ROI to recommend changes
- **SEM** – Monthly review meetings with both ATN and your Green Line Digital team
- **Reporting** – Create daily, weekly and monthly reports that will flow from the BDC. & Sales Department We'll make sure we know exactly where to find the relevant data in the CRM, and have a convenient way to communicate the reports to Management and Ownership.



## Sales Showroom Processes

*Sales Department Sales Process & Customer Experience*

Document Ref: 4K2SE-VMDEV-JDOZ9-KZN77

## Customer First - Sales Process

- Customized Sales Process Training
- Measure Steps to the Sale
- Improve Showroom Closing Rate



## ATN Financial

*Finance Department Growth & Management*

## ATN Financial - F&I Training

- Overcoming Objections
- Compliance
- 1-on-1 Training
- Desking Strategies
- Menu Selling Strategies



## Black Ops

*Fixed Operations Management*

- Appointment Setting
- Greeting & Service Walk-Around
- Dispatching
- Inspection, Parts Ordering & Estimate
- Consultation, Approval, and Customer Communication
- Service Delivery
- Parts Order/Special Order Process

- Document all current processes & tweak for efficiency



# Brand Ads

*Dealership Branding & Marketing*

## Branding

- Custom Logo Creation/Refining
- Website Theme Redesign - Update existing website with any changes made to branding and logos
- POS Material Design - Brochures, Signage, etc.
- Custom Digital Banners & Design



# Executive Management & Review

- **Monthly Executive Visits**
- **Monthly Financial Statement Reviews**
- **Full Accounting Department Installation and Deployment**
- **Month End Process Installation**
- Profitability Analysis
- Inventory Management & Review
- Remote and Live Accounting Support
- **Weekly Meetings** to Review and Track Progress Across All Projects

## Executive Management Training

- Monthly Department Manager Training
- Quarterly Department Manager MBO Meetings

**Automotive Training Network**

This Client Services Management Agreement (the "Agreement") states the terms and conditions that govern the contractual agreement between Automotive Training Network having its principal place of business at 15020 N Hayden Rd, STE 202, Scottsdale, AZ 85260 (the "Provider"), and Aaron Ford of Poway, Aaron Ford of Lake Elsinore, Aaron Ford of Escondido, Aaron Chevrolet, Aaron CDJR of Norco (collectively Aaron Auto Group or the "Client") who separately and collectively agrees to be bound by this Agreement.

WHEREAS, the Provider is offering the Client general management operation services in the field of Automotive Dealerships, starting fully on March 1, 2026; and WHEREAS, the Client desires to retain the services of the Provider with regard to its own business, according to the terms and conditions herein.

NOW, THEREFORE, in consideration of the mutual covenants and promises made by the parties hereto, the Provider and the Client (individually, each a "Party" and collectively, the "Parties") covenant and agree as follows:

**1. Services Provided**. The Client hereby agrees to engage the Provider to provide the Client with services (the "Services") consisting of:

a. **Management Services for their Company.** These services will include analyzing customer needs and current business obstacles, identifying projects, scoping potential business solutions, improving processes by coordinating efforts through personnel and process training, advising marketing approaches and recommending products and/or services. Services including but not limited to, personnel deployment, process development & execution, expense approval & allocation, and overseeing revenue process & procedures. The common reporting mechanism for performance evaluation is the monthly financial statements or the adjusted statements, including Provider recommendations that were not implemented.

b. The Services will also include any other tasks which the Parties may agree on. The Provider hereby agrees to provide such Services to the Client.

**2. Term**. Provisions relating to the term of this Agreement are outlined herein:

a. The term of this Agreement shall begin on March 1, 2026, **with an onboarding month in February 2026 to include preparation and set up visits**, subject to a 6 month term (Initial Term); thereafter it shall remain in force on a month to month contract, until terminated by either Party at the end of any term by providing 60 days prior notice thereof. Any notice of cancellation from either Party must be provided in writing.

b. Provider may immediately terminate the Agreement without need of prior notice and/or immediately terminate all or part of the Agreement without liability for: (i) non-payment of amounts due Provider, (ii) Client's breach of the covenants of the Agreement, or (iii) if Client ceases to conduct business, becomes insolvent, files for bankruptcy, becomes the subject of an involuntary bankruptcy proceeding, makes a general assignment for the benefit of creditors, or upon appointment of a receiver for Clients property. If Provider terminates this Agreement or any Services, Client will be obligated to pay all accrued amounts up to the date of termination, as well as all sums for the remainder of the applicable term. Client acknowledges that it may not use Services in any capacity immediately upon termination of the Agreement and any such use shall be deemed to unlawfully infringe Provider's intellectual property rights. Notwithstanding anything to the contrary contained in this Agreement, Client shall have the right to terminate this Agreement at any time upon written notice to the Provider for a material breach, if such breach remains uncured for ten (10)

business days after the breaching party received written notice of the breach, unless such time is extended by mutual agreement of Client and Provider or such breach is incapable of being cured.

**3. Payments.**

a. **Monthly Fee**. The monthly fee with respect to the Services shall be an amount equal to ~~$19500~~ $18,000 per dealership location for four (4) locations, with lesser balances as referenced below under "Monthly Price" as reflected on the final signature page during the term of this Agreement ("Monthly Fee"). The Monthly Fee for the first full calendar month of the Term (the "First Monthly Fee"), including any prorated Monthly Fee for any partial calendar month at the beginning of the Term, is due and payable to Provider on the first of March 2026. All subsequent Monthly Fees shall thereafter be due and payable to Provider on the first day of each calendar month during the Term.

b. **On Boarding Month.** The on boarding month is scheduled for February 2026. Onboarding fee is equal to the monthly fee in an amount equal to $18,000 per dealership. This fee is due and payable to Provider upon execution of this Agreement by Client. On boarding fees include tighter than normal advance window for Client to access all data management systems, installing reporting mechanisms and setting up customized Snapshot reporting for all departments. **Client agrees to provide timely responses in February 2026 to allow for a successful On Boarding Period, at the Client's request.** Client will also establish proper setups in CRM, DMS and Inventory Management systems to allow installation of best practices in each data system and create custom reporting in each system. **On Boarding Fee also includes the cost and travel expense of the initial Kickoff Meeting in mid February where Provider brings the majority of their assigned team members to the Client, on premise for Client/Provider Kickoff Meeting to commence meeting protocols, reporting processes and one on one reviews with all staff, as described herein.**

c. **Non-Payment.** Upon effectiveness of this Agreement, thereafter if Client fails to make a Monthly Fee payment when due and payable, which is not paid in full within 10 days after required payment date, all late fees as described in Section F. will be charged and will not be waived. In addition, the Provider reserves the right, in its sole discretion, to terminate this Agreement immediately upon notice to Client, without any further liability or obligation to fulfill services by the Provider. Client shall remain responsible for all remaining unpaid Monthly Fees, including, without limitation, a prorated Monthly Fee for the partial month through the date of contracted termination date. Client will also be responsible for any and all collection fees incurred by the Provider, including reasonable attorney fees. Any payments unpaid after 60 days will be subject to security interest in the favor of the Provider, placed as a UCC-1 asset filing on the clients dealership assets. Prior to any such filing, the Provider will offer written notice on intent to file, 30 days prior to any such filing.

d. **Reimbursement of Expenses.** In connection with providing the Services herein, Client agrees to promptly reimburse the Provider for reasonable expenses, which may include but are not limited to: travel expenses (including air travel, hotel and/or other lodging, rental vehicle(s), fuel, and daily meal "per diem" of $75.00), prepaid advertising and/or promotional material expenses, prepaid supplies and/or equipment for Client's use, and/or other miscellaneous expenses as approved in advance in writing by Client. Provider will be responsible to submit a reimbursement request directly to the Client, and Provider will furnish statements to the Client for all such expenses. All reimbursement amounts shall become due and payable immediately upon receipt by the Client.

e. **Payment Methods.** The Client agrees to remit all payments via ACH/electronic transfer directly through the billing software as provided by the Provider. **Client acknowledges that the Provider does not accept**

**paper checks.** As a convenience, the Provider may allow the option to remit payment via credit card, subject to the following terms:

1. Any amount paid via credit card will be subject to an additional technology fee of 2.0% of the payment amount, which fee is collected and retained by the third-party payment processor for usage of their technology platform.

f. **Additional Payment Terms.** All payments shall be due and payable as of the due date stated within each invoice. A late fee of ten percent (10%) of the invoice balance shall apply to any invoice unpaid as of ten (10) calendar days after its respective due date, and interest will be charged on any outstanding past due balance at a rate of twelve percent (12%) per annum. The Client agrees to provide a valid credit card to the Provider immediately upon execution of the Agreement, which shall be kept on file and will be updated by the Client upon request of the Provider. The Client agrees that if any balance should become past due, the Provider is authorized to charge the outstanding balance to the credit card provided in lieu of any late fee being assessed (subject to the terms of credit card payments listed above). The Client will provide the name(s) and email address(es) of its billing contact person(s); the Client is responsible to notify the Provider of any changes to these contacts in writing no less than ten (10) business days prior to any billing date.

**4. Ownership of Intellectual Property.** All intellectual property and related material (the "Intellectual Property") including any related work in progress that is developed or produced by Provider under this Agreement, will be the property of the Provider. The Client is granted a non-exclusive limited-use license of this Intellectual Property. Nothing in this Agreement is intended to transfer title to or other interest in any intellectual property rights of Provider. Client expressly acknowledges and agrees, subject to the grant of license pursuant to this Agreement, that all right, title and interest in and to such intellectual property rights remain with Provider. The Client retains their rights to Intellectual Property already created or also related to their own business, including marketing, processes and policies previously in place, prior to this agreement and all customer data, including leads, lists, contact information, etc. gathered during the term of this agreement.

**5. Confidentiality**. Each Party agrees to protect the confidentiality of all proprietary or competitively sensitive information, material, data, business affairs, methods of operation, computer programs, software, web services, employees, customers, vendors, documentation, finances, and other such information whether written, oral, or otherwise of a disclosing Party, which is received from a disclosing Party or which is otherwise acquired by a receiving Party pursuant to or generated as a result of performance under this Agreement. This includes, without limitation, all Non-Public Personal Information as defined by the Federal Trade Commission and applicable laws, concerning the financial condition, social security numbers, account numbers, and other sensitive data of consumers. The receiving Party shall not disclose such confidential information to any third party, either directly or indirectly, without the express written consent of the disclosing Party in each and every instance, and such confidential information will not be used by the Receiving Party (or any of its equity owners, directors, managers, officers, employees, representatives, subcontractors or agents) for any purpose other than the receiving Party's performance under this Agreement. Both Parties will take reasonable steps to indicate to the other such information as they deem proprietary, competitively sensitive or otherwise confidential at the time of disclosure, but the failure to label the information as confidential shall not limit the applicability of this Section. However, neither Party will be obligated to keep confidential any information that (a) was in the possession of the receiving Party prior to this Agreement and not subject to an obligation of confidentiality, (b) was lawfully obtained from a third party, free of any obligation of confidence, (c) is required to be disclosed pursuant to applicable legal and/or regulatory requirements, provided that the disclosing Party will consult with the other Party prior to make such required disclosure, or (d) is known generally to the public through no fault of the receiving Party. Client agrees that some of its information may

be converted to an anonymized and/or statistical format and then be used by the Provider in order to provide composite comparisons with other similar businesses. The Client acknowledges that it will also be granted anonymized and/or statistical comparative composite data from other similar businesses by the Provider from time to time.

**6. Indemnification.** Client shall defend, indemnify and hold harmless Provider and its affiliates, and their respective equity owners, directors, managers, officers, employees, representatives, subcontractors and agents (collectively, the "Indemnities") from and against any damage, liability, loss, cost and expense (including court costs and reasonable attorneys' fees) that any of them may incur, suffer or be required to pay pursuant to any actual or threatened claim, demand, action, suit, litigation, charge, complaint, prosecution or other proceeding of any nature or kind whatsoever (each, a "Claim") that may be made or asserted against any Indemnity arising out of (a) the use of, by Client or its affiliates, any product or service developed, manufactured, marketed, distributed or sold by Client or its affiliates based on, arising from or related to the Services provided, and (b) any actual or alleged breach by Client of any provision of this Agreement. Provider shall defend, indemnify and hold Client harmless to (a) any Claim that the Services or any such product or service instituted by the Provider does not comply with any applicable law, rule or regulation and (b) any Claims which may become subject in connection with any acts of the Provider in breach of its respective duties, obligations and covenants under this Agreement, resulting from gross negligence, willful misconduct, illegality or fraud of the Provider. The indemnification of the Indemnities shall survive the termination of this Agreement.

**7. Limitation of Liability.** UNLESS A CLAIM IS BASED IN FRAUD, GROSS NEGLIGENCE OR OTHER INTENTIONAL TORT, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR INCIDENTAL DAMAGES OF ANY KIND WHATSOEVER (INCLUDING LOST OR ANTICIPATED REVENUES OR PROFITS) ARISING FROM ANY CLAIM RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, WHETHER SUCH CLAIM IS BASED ON CONTRACT, DEFECT, WARRANTY, TORT OR OTHERWISE, EVEN IF A PARTY IS ADVISED OF THE LIKELIHOOD OR POSSIBILITY OF SAME.

**8. Mutual Non-Compete/Non Solicitation.** Other than with the express written consent of the other87,  Parties agree to the following during the continuance of this Agreement and for one (1) year thereafter:

a.  Neither Party shall divert or attempt to divert any business that the other Party has enjoyed, solicited, or attempted to solicit, from other individuals or corporations, prior to termination of this Agreement.

b.  Neither Party shall solicit, hire and/or attempt to engage any current or former employee of the other Party, subject to the following exception(s):

  I.  Provider agrees to provide the Client an option of waiving this provision 8.b subject to the remittance of a one-time Training Fee of $100,000.00 USD per instance of waiver.

  II.  This clause only applies to employees hired by either party directly. Neither party can control or bear responsibility for employees who choose to seek employment from any other third party employer not owned by either party.

**9. General Provisions.**

a.  Independent Contractors. With respect to this Agreement, the status of the Parties, including their employees and agents, shall be that of independent contractors and not as employees, agents or fiduciaries of the other Party, and as such, neither Party shall have the right to make any commitments for or on behalf

of the other Party. Nothing in this Agreement shall create any association, partnership or joint venture between the Parties.

b.  Special Future Discounts. As a gesture of additional goodwill and consideration during the term of this Agreement, the Client shall receive the following discount(s) to advertised retail prices of the following separate services offered by Provider (subject to the respective terms of those agreements):

    I.  A 33% discount reduction on all workshops, Bootcamps and classroom sessions attended during the contract period.

    II.  A 50% discount for materials will apply for materials purchased during the contract period.

c.  Entire Agreement. This Agreement, together with any activation form, Form W-9, and other form reasonably required by Provider, represents the entire agreement between the Parties with respect to subject matter hereof and thereof and shall supersede all prior agreements and communications of the Parties, oral or written, related thereto.

d.  Benefit of the Bargain; Survival. The Parties have executed this Agreement in reliance upon the limitations and exclusions of liability, the disclaimers of warranties and damages, and indemnification obligations set forth herein, and the same form an essential basis of the bargain between the Parties. The limitations and exclusions of liability and disclaimers specified in this Agreement, as well as the confidentiality provisions, shall survive and apply after termination of this Agreement and even if other provisions of this Agreement are found to have failed of their essential purpose.

e.  Amendment and Waiver. No amendment to, or waiver of, any provision of this Agreement shall be effective unless in writing and signed by both Parties. The waiver by any Party of any breach or default shall not constitute a waiver of any different or subsequent breach or default.

f.  Governing Law. This Agreement shall be governed by, and construed according to, the laws of the State of Arizona without regard to conflicts of laws rules that would otherwise apply laws of any other state or jurisdiction. Any litigation related to this Agreement shall be brought in the state or federal courts having jurisdiction over Maricopa County, Arizona, and the Parties hereby irrevocably consent to the exclusive personal jurisdiction of such courts for such purpose, all without waiving any right to remove to federal court.

g.  Assignment; Sublicense. Client may not assign or transfer this Agreement, or sublicense, assign or delegate any right or duty under this Agreement, without Provider's prior written consent. Any assignment, other transfer or attempted assignment or other transfer in breach of this Section shall be void and of no force and effect. Provider and its subsequent assignees may assign this Agreement, in whole or in part, or any of its rights or delegate any of its duties, under this Agreement to any party. In the event of an assignment of this Agreement by Provider, Client may terminate this agreement, without fee or penalty, upon ten (10) days written notice.

h.  Force Majeure. Except for any payment obligations hereunder, neither Party will be liable or deemed to be in default under this Agreement for any delay or non-performance is caused by fire, storm, flood, riot, strike, war, insurrection, accident, or other causes beyond its control and without its fault, provided that the affected Party will use its commercially reasonable efforts to cure such a force majeure condition and comply with the terms of this Agreement as quickly as possible to the reasonable satisfaction of the other Party.

i.    Severability. If a court of competent jurisdiction finds any provision of this Agreement unenforceable, all other provisions shall remain in full force and effect and the unenforceable provision shall be replaced with and enforceable provision that most nearly achieves the intent and economic effect of the unenforceable provision.

j.    Counterparts. This Agreement may be executed in two counterparts, both of which taken together shall constitute a single instrument. Execution and delivery of this Agreement may be evidenced by a facsimile or other electronic transmission.

k.    Third-Party Company Data Transfer. The Client authorizes the Provider to provide information to third parties for the sole purpose of effecting the intent of this Agreement.

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, both Parties by its duly authorized officer, as of the day and year set forth below.



# ATN Consulting Summary

| Product | Monthly Price |
|---|---|
| **ATN Client Management Package**<br>Three executive visit monthly to review financials, performance and set plans for the following month, as well as Executive Strategy Sessions. Ten separate specialist visits for all locations, plus daily remote services. Added visits may be provided as agreed upon by the Client and the Provider, based on need and performance. | ~~$19,500/mo~~ $  - 0 -    mo billed to Aaron Ford of Poway<br>~~$19,500/mo~~ $18,000/mo billed to Aaron Ford of Lake Elsinore<br>~~$19,500/mo~~ $18,000/mo billed to Aaron Chevrolet<br>~~$19,500/mo~~ $18,000/mo billed to Aaron CDJR of Poway<br>~~$19,500/mo~~ $18,000/mo billed to Aaron Ford of Escondido<br><br>**(OEM Multi Store Discount Provided up front, due to potential of future added store, a New Kia Dealership)**<br><br>**Actual Travel Expenses Billed Separately, Per visit per specialist** |

| Automotive Training Network, LLC | Aaron Auto Group |
|---|---|
| Signature: *Mark Gilbert* | Signature: *Vikas Mehandroo* |
| Printed Name: Mark Gilbert | Printed Name:    Vikas Mehandroo |
| Title: CEO | Title:        Dealer Principal |
| Date:    01 / 16 / 2026<br><br>("Effective Date") | Date:    01 / 16 / 2026<br><br>("Effective Date") |

# CERTIFICATE *of* SIGNATURE

REF. NUMBER
**4K2SE-VMDEV-JDOZ9-KZN77**

DOCUMENT COMPLETED BY ALL PARTIES ON
**22 JAN 2026 21:23:56**
**UTC**

| SIGNER | TIMESTAMP | SIGNATURE |
|---|---|---|

**VIKAS MEHANDROO**

EMAIL
**MEHANDROO.VIKAS@GMAIL.COM**

SENT
**22 JAN 2026 18:49:11**

VIEWED
**22 JAN 2026 21:09:10**

SIGNED
**22 JAN 2026 21:10:05**

*Vikas Mehandroo*

IP ADDRESS
**68.6.134.19**

LOCATION
**ESCONDIDO, UNITED STATES**

**RECIPIENT VERIFICATION**

EMAIL VERIFIED
**22 JAN 2026 21:09:10**

---

**MARK GILBERT**

EMAIL
**MRG@ATNTRAINING.COM**

SENT
**22 JAN 2026 18:49:11**

VIEWED
**22 JAN 2026 21:23:43**

SIGNED
**22 JAN 2026 21:23:56**

*Mark Gilbert*

IP ADDRESS
**72.194.53.10**

LOCATION
**SCOTTSDALE, UNITED STATES**

**RECIPIENT VERIFICATION**

EMAIL VERIFIED
**22 JAN 2026 21:23:43**

